UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
MICHAEL RODRIGUEZ,                        :

    Petitioner,                  :   **REPORT &**
               **RECOMMENDATION**
              :
   -against-                       :  **07 Civ. 415 (SAS)(MHD)**

              :

ROBERT ERCOLE, Superintendent,            :
Greenhaven Correctional Facility,
    Respondent.                  :
----------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 07/17/08

TO THE HONORABLE SHIRA A. SCHEINDLIN, U.S.D.J.:

   Michael Rodriguez has petitioned, pursuant to 28 U.S.C. §
2254, for habeas corpus relief from his November 24, 2004
conviction in the New York State Supreme Court, Bronx County, on
one count of Assault in the First Degree, under New York Penal Law
("N.Y.P.L.") § 120.10(1). The court sentenced him to a determinate
prison term of ten years, which he is currently serving, plus five
years of post-release supervision.[1]

---

[1] Additionally, though the New York Supreme Court
acknowledged that it would be inappropriate to impose a DNA
databank fee, pursuant to N.Y.P.L. § 60.35(1)(e), because
petitioner's conviction occurred before the statute took effect,
court personnel nonetheless imposed the fee on petitioner.
Respondent agreed with petitioner's contention that this charge
was imposed improperly, and it was accordingly vacated by the
Appellate Division. People v. Rodriguez, 33 A.D.3d 389, 390, 821
N.Y.S.2d 755, 755 (1st Dep't 2006).

1

Petitioner challenges his conviction on the ground of ineffective assistance of trial counsel. He asserts that the representation that he received at trial was objectively deficient because his counsel failed to object to the general self-defense justification charge given by the trial judge, under N.Y.P.L. § 35.15(2)(a), and did not request an alternative robbery-defense justification, under N.Y.P.L. § 35.15(2)(b). The difference between the two charges is that the general self-defense justification charge given in this case includes a duty to retreat and provides that deadly physical force may be used only in defense against actual or imminent deadly physical force. In contrast, the robbery-defense charge allows a person to use deadly physical force if he reasonably believes that the other person is attempting to commit, inter alia, robbery, and imposes neither a duty to retreat nor a requirement that deadly physical force be used only to defend against deadly physical force. See, e.g., Lebron v. Mann, 40 F.3d 561, 563 (2d Cir. 1994).[2] Petitioner concludes that counsel's failure in this regard was grievously prejudicial and that it is reasonably probable that the verdict would have been different had the proper charge been submitted to the jury.

_____

[2] The section allowing this more lenient defense may be invoked not only in case of a robbery, but also to defend against kidnaping, forcible rape and other forcible criminal sexual acts. N.Y.P.L. § 35.15(2)(b).

2

Respondent argues that petitioner's claim is without merit. Principally, he asserts that the Appellate Division's decision -- that trial counsel's failure to request a robbery-defense charge was not prejudicial to petitioner because the evidence overwhelmingly contradicted any version of a justification defense -- was not an unreasonable application of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), and its progeny.

We conclude that the claim is meritless.

I. <u>Prior History</u>

We briefly summarize the state-court proceedings as well as the proceedings in this court.

A. <u>Charges, Trial and Sentencing</u>

On October 23, 2002, a Bronx County grand jury charged petitioner with Attempted Murder in the Second Degree, Assault in the First Degree (two counts), Assault in the Second Degree (two counts) and Criminal Possession of a Weapon in the Fourth Degree. (Aff. in Opp'n to Pet. for Habeas Corpus of Ass't Dist. Att'y

3

Rither Alabre Ex. 2 at 3). The charges stemmed from the stabbing of
a man named Roberto Rivera on a Bronx street on October 3, 2002.
Petitioner went to trial before the Hon. Phylis Skloot-Bamberger,
J.S.C., and a jury on April 28, 2004.[3] (T2. 1).[4]

(i). The State's Case

The State first called the complainant, Rivera, and began
direct examination with an inquiry into his extensive criminal
history. Rivera admitted to having pled guilty to a litany of
crimes, starting thirteen years before this incident.[5] After

_____

[3] The trial transcripts provided to us begin with the
proceedings on April 29, the day after jury selection concluded.
In the Corrected Brief for Defendant-Appellant, counsel mentions,
in a footnote, that voir dire originally began on April 23, 2004,
but the court declared a mistrial on April 27, during jury
selection. Jury selection began again on April 28. (Alabre Aff.
Ex. 1 at 3 (Corrected Br. for Def.-Appellant) ("Corr. Br.")).

[4] Citations labeled with T1. refer to the sequentially
numbered trial transcripts for proceedings that took place on
April 29, 2004, featuring the preliminary instructions. Citations
labeled T2. refer to the transcript for the proceedings that took
place on April 29, April 30 and May 3, 2004. Citations labeled
T3. refer to the trial transcripts for the proceedings that took
place on May 3 and May 5, 2004, featuring the summations and
charge conference. Citations labeled T4. are from the October 19,
2004 transcript. Citations labeled T5. are from the November 15,
2004 adjournment proceedings. Citations labeled T6. are from the
November 24, 2004 sentencing hearing.

[5] On February 28, 1989, at the age of 17, Rivera pled guilty
to two counts of possession of heroin with intent to sell, and
received a sentence of one to three years in a state facility; on
November 30, 1993, he pled guilty to another count of possession

4

eliciting these admissions, the prosecutor questioned Rivera about
the incident with Michael Rodriguez.

Rivera testified that at approximately 1:00 A.M. on October 3,
2002, after having ingested cocaine and marijuana, he and his then-
girlfriend, Haydee Perez, drove to a 24-hour store in the Bronx to
purchase cigarettes. (T2. 14-16).[6] Upon arriving, Rivera noticed
Rodriguez, whom he knew by the street name "Sleepy," standing near

_____

of heroin with intent to sell, and received a sentence of one and
a half to three years; on March 15, 2002, he pled guilty to a
misdemeanor count of unauthorized use of a motor vehicle that he
had stolen, and received a sentence of one year, which he served
at Rikers Island; on January 7, 2002, in the City Court in
Yonkers, he pled guilty to the crimes of possessing burglary
tools and criminal mischief, for which he received 60 days, time
served; on January 14, 2002, in the Bronx, he pled guilty to
possessing burglar's tools, and was sentenced to time served; on
February 11, 2002, he once again pled guilty to unauthorized use
of a vehicle for driving an automobile he had stolen, and
received another year at Rikers Island; on September 26, 2002,
Rivera pled guilty to misdemeanor possession of marijuana and
received five days community service; and on December 11, 2002,
Rivera pled guilty to a charge of conspiracy for acting as the
look-out for an armed robbery that occurred on August 16, 2002,
for which he received one year at Rikers Island. (T2. 3-12).
Rivera stated that he had spent approximately seven to eight
years incarcerated since the age of 17. (Id. at 13).

[6] On cross-examination, defense counsel inquired why Rivera
would travel three miles at 1:00 A.M. to purchase cigarettes.
(T2. 59). He responded that he did not know of any stores open at
that hour that were located closer to the hotel at which he and
his girlfriend were staying. (Id. at 58-60). He further stated
that he went to that particular store not just to purchase
cigarettes, but also because he was familiar with the
neighborhood and was "just going back to the block." (Id. at 60).

5

the store. (Id. at 17, 34). Rivera testified that he knew which building Rodriguez was living in at that time, as he had seen him "[a]round the block" over the previous two years, but that he had never had a conversation, argument or fight with Rodriguez. (Id. at 19). Rivera said, "What's up" to Rodriguez, but got no response. (Id. at 19-20).

Rivera reported that as he was walking back to his car he was hit twice in the back. (Id. at 21-22). Upon turning around, he noticed that he had blood on his shirt and that Rodriguez was holding a knife. (Id. at 22-23, 56). Rivera concluded that he had been stabbed. (Id.). He attempted to flee, but fell when he ran into the side of a van, at which point Rodriguez stabbed him twice more in the side. (Id. at 24-25). Rivera then got up, ran to the car driven by his girlfriend and jumped on the hood. (Id. at 26, 54-55). Perez drove about half a block, at which point she stopped, Rivera got into the vehicle, and she drove him to Lincoln Hospital. (Id.). Rivera reported that the only thing that Rodriguez said during the assault was, "You think shit is sweet?" (Id. at 27). Rivera indicated that he interpreted this to mean that Rodriguez was accusing him of being arrogant. (Id.). While at the hospital, Rivera reported that he had been stabbed when someone attempted to rob him. (T2. 67-68, 76-78).

6

Rivera testified in response to defense counsel's questions that he told the hospital staff that he had been stabbed during an attempted robbery. (Id. at 68). As for what he told the police, Rivera stated that his ex-girlfriend, Perez, had made the police complaint, but that when he was interviewed by the police, he told them that he had been stabbed during an attempted robbery. (Id.). On re-direct, Rivera was asked whether he guessed or knew for certain that Rodriguez was attempting to rob him when he was stabbed, and Rivera responded, "I took a wild guess. That's what come to my head that night, you know, I couldn't think of nothing else. Like I said, I didn't have no problems with him." (Id. at 77).

The State next called Police Officer Ismael Medina. (Id. at 79). He testified that on October 16, 2002, he and Sergeant Anthony Acosta and an Officer Pinero had arrested Rodriguez for stabbing Rivera. (Id. at 80-81).[7] While they were transporting Rodriguez in their unmarked police vehicle, Rodriguez said, "People with sticky fingers deserve to get stuck." (Id. at 83). Medina testified that he interpreted this statement to mean that "people [who] take things deserve to get stabbed." (Id. at 83-84).

_____

[7] Officer Pinero does not appear anywhere else in the record. We were unable to ascertain any further information about him, including his first name.

7

Next, the State called Sergeant Acosta to the stand. He identified himself as the "interviewing supervisor" who had interviewed Rivera about the October 3 stabbing. (Id. at 99). He stated that on October 15, 2002, while conducting this interview, he had asked Rivera whether "he needed to put certain skeletons in his life away." (Id. at 101-02). At that point Rivera admitted he had been involved in a crime. (Id. 102-04).[8] Subsequently, Acosta read Rivera his Miranda rights, at which point Rivera waived his right to counsel and then gave a full statement regarding his involvement in an August 16, 2002 robbery. (Id. at 50, 104). The information that Rivera gave the police was pivotal in the robbery investigation, which had been closed at that time for lack of evidence. (Id. 105-06).

The State then called Sergeant Kevin Cavanaugh, one of the officers who had arrested Rodriguez. (Id. at 113-14). He testified that on October 16, 2002, based on the information provided by Rivera, he went to 939 Faile Street in the Bronx, accompanied by Acosta and Medina, looking for Rodriguez. (Id. at 113-15). Upon locating Rodriguez, he called Rodriguez's nickname, "Sleepy," out of the window of the vehicle. (Id. at 115). Rodriguez turned to look at Cavanaugh, who then said, "Police." (Id. at 115). Rodriguez

---

[8] Rivera pled guilty to this crime on December 11, 2002, and was sentenced to one year. (Id. at 12).

8

began to flee but was apprehended by a uniformed officer after about two blocks. (Id. at 115-16).

For its last witness, the State called Dr. Samuel Kigongo, the surgeon at Lincoln Hospital who had treated Rivera's wounds. (Id. at 121-22, 124). Dr. Kigongo's records indicated that Rivera had suffered four stab wounds, each measuring one centimeter by three centimeters: one to the right chest, one to the border between the left chest and abdomen, one on the lower-left back, and one further wound on the left chest and abdominal area. (Id. at 134, 136-37).[9] One of the wounds to Rivera's left chest and abdominal area caused life-threatening internal bleeding, and Rivera suffered substantial blood loss, a collapsed lung and injuries to the heart or to the structures around it. (Id. at 128-29, 134, 136-37). Dr. Kigongo opined that these wounds were inflicted by force with a sharp instrument. (Id. at 137-38, 146). In response to questions asked by the defense attorney, the doctor stated that he did not have

---

[9] The record is not entirely consistent with regard to the location of Rivera's stab wounds. Rivera himself testified that Rodriguez had stabbed him twice in the lower back and twice in the side. (T2. 22-23, 25-26, 31). Additionally, earlier in Kigongo's testimony, he stated that "the final diagnosis is listed as stab wounds, multiple, to the back and to the abdomen," though he later stated that Rivera also received wounds to the chest. (Id. at 128). These discrepancies, however, are most likely semantic and due to the contrast between the precise medical terminology used by Kigongo and Rivera's own more colloquial description of his wounds.

sufficient information to determine whether the knife had entered Rivera's body straight or at an angle, and without having been personally present at the stabbing, he could not determine how Rivera had received the stab wounds. (Id. at 139-40, 144-46).[10]

### (ii). The Defendant's Case

Rodriguez testified in his own defense. (Id. at 151). He asserted that he had gone to the store to purchase cigarettes and cigars, and that he had then entered a phone-booth in front of the store. (Id. at 154-55, 164-65). While he was in the phone-booth, Rivera, a former drug customer of his whom petitioner had known for approximately two years, "crept up" behind him and asked him for drugs. (Id. at 155). Rodriguez said that he had no drugs. (Id. at 156). Rivera then pulled a knife and demanded, "Give me the money." (Id.).

Rodriguez claimed that he thought Rivera intended to stab him, as Rivera had the knife pointed at "his abdominal level." (Id. at 156, 169). He therefore "grabbed [Rivera's] arm" and they "tussled"

---

[10] Kigongo stated that since he was not present at the stabbing, he was unable to determine whether Rivera had been stabbed during a struggle in which more than one person was holding the knife or whether he had been stabbed in a more direct "back and forth" motion. (Id. at 145-46).

10

in the phone-booth for a matter of seconds, "no longer than a minute." (Id. at 156). According to Rodriguez, Rivera then fled, got into a car and departed from the scene. Rodriguez then went to a neighborhood bar to have a few drinks to "calm [himself] down." (Id. at 155). He testified that he did not go to the police because he had been robbed in the past and had not made complaints, and because the robbery attempt had not succeeded, and he did not believe that anyone had been hurt. (Id. at 155-56).

During cross-examination, Rodriguez asserted that the struggle with Rivera occurred face-to-face, and insisted that he did not know how Rivera had been stabbed and in fact had not even noticed that Rivera had been stabbed. (Id. at 170-73). He also said that he had not seen any blood on Rivera's shirt, that he did not recall striking Rivera at all and that he had no recollection as to whether he had ever grabbed the knife from Rivera. (Id. at 171-72). Rodriguez admitted, however, that Rivera may have been stabbed in the "tussle." (Id.). He also conceded that he himself had not been injured, and that he therefore had not reported the attempted robbery to the police.[11] (Id.). When asked about his comment to the arresting officers -- that "sticky fingers deserve to get stuck," in reference to Rivera's stabbing -- he testified that he had meant

---

[11] Rodriguez also gave other explanations for why he did not report the robbery. See p. 11, supra.

11

that "what goes around, comes around," reiterating what he had said on direct examination. (Id. at 159-60, 179-83).

### (iii). The Charge Conference

At the charge conference, defense counsel requested that the court give a justification charge to the jury. (T3. 5-6). The court inquired as to what particular charge defense counsel sought, asking, "Are you asking for deadly physical force or physical force or what are you asking for?" (Id. at 6). Counsel stated that he sought a charge on the use of deadly physical force. (Id.). A discussion ensued concerning the location of the wounds and which of them was life-threatening. (Id. at 7-11).[12] Specifically, the court was concerned about the wounds inflicted on Rivera's back and opined that it was "physically impossible" for those wounds to have been inflicted when both Rodriguez and Rivera were holding the knife. (Id. at 16). The court indicated that if Rivera and Rodriguez were holding the knife simultaneously, it would not be

_____

[12] The court asked defense counsel whether it was "two wounds into the chest and two wounds into the lower back or the lower back toward the side?" (Id. at 11-13). Counsel confirmed that this was true. The prosecutor stated, "There were two to the lower left side of his back," and added that there were also two to Rivera's chest. Further discussion followed, in which the prosecutor referred to Kigongo's testimony, located on page 136 of the trial transcript. (Id. at 9). Discussion on this specific subject ended when the court examined a diagram of the wounds. (Id. at 12-13).

12

possible to generate enough force to inflict wounds of the nature suffered by Rivera. (Id. at 17-18).

Additionally, the court reminded defense counsel of the duty-to-retreat requirement of the justification charge, to which the attorney replied that at the time of the assault Rodriguez was blocked inside a phone-booth by Rivera. (Id. at 19-20). The judge responded that there was no evidence to support this contention. (Id. at 20). The court also expressed hesitation about giving a justification charge because Rodriguez had claimed that he did not stab Rivera. (Id. at 21). The court stated that it was uncertain how it would rule on the charge issue, and that if either the prosecutor or defense counsel had a prepared charge, they should submit it the next day. (Id. at 21-22). The prosecutor then asked the court whether the standard justification charge under these circumstances was the Goetz charge, referring to People v. Goetz, 68 N.Y.2d 96, 506 N.Y.S.2d 18 (1986). The court said it was. (Id. at 23).

   iv. Summations

On May 5, 2004, counsel made their summations. Consistent with defense counsel's request for a justification charge, both

13

attorneys focused on this defense.

Rodriguez's attorney made four primary arguments. First, he argued that because Rivera was a self-professed drug dealer who had taken both cocaine and marijuana shortly before the incident, his testimony should be discounted. (Id. at 28-29). Second, he contended that it was highly unlikely that Rivera would drive several miles in the middle of the night just to find cigarettes. (Id. at 29). Instead, he suggested that Rivera's motivation was to go to a neighborhood where he thought he could procure drugs, and that upon arriving, he had approached Rodriguez, who had previously sold him drugs on occasion. (Id. at 30-31). According to counsel, when Rivera discovered that Rodriguez had no drugs to sell, Rivera attempted to rob him. (Id.). Third, defense counsel asserted that one could plausibly imagine that the wounds suffered by Rivera could have been inflicted in the sort of struggle that Rodriguez had described. (Id. at 32-33).[13] Finally, he contended not only that Rodriguez's account of the events was possible, but further that it was more plausible than Rivera's explanation, and that Rodriguez did "the only thing he could to defend his own life" by acting in self-defense during a struggle initiated by Rivera. (Id. at 27, 39-

---

[13] Counsel for petitioner also suggested that Rodriguez had been effectively trapped in a phone-booth by Rivera, but the court sustained an objection to that line of argument for lack of evidence. (Id. at 31-32).

14

40).

   The prosecutor, in summation, argued that there was no doubt
that Rodriguez was the person who had stabbed Rivera, and that the
nature and number of the wounds inflicted upon Rivera not only
belied any theory of self-defense, but clearly indicated an intent
to kill Rivera. (Id. at 43-45). Additionally, the prosecutor argued
that Rodriguez's failure to report Rivera's alleged attempted
robbery -- and his statement to the police that "sticky fingers get
stuck" -- further compelled the conclusion that Rodriguez was
guilty. (Id. at 57-61).


   v. The Jury Charge


   The record does not reflect whether either party submitted a
proposed jury charge on justification as solicited by the court,
and the court apparently made no ruling on the record as to whether
it had decided to include such a charge. Nonetheless, the judge did
instruct the jury on self-defense in conformity with sections
35.15(1) and (2)(a) of the Penal Law, that is, self-defense against
deadly physical force.[14] (Id. at 77-87). That set of instructions

------------------------

   [14] Sections 35.15(1) and (2) of the Penal Law, in pertinent
part, provide as follows:

15

accurately placed the burden of proof on the State and summarized

the elements of the defense, including the limitation that deadly

physical force not be used unless necessary to respond to deadly

physical force, and the duty to retreat if possible.[15]

_____

1. A person may, subject to the provisions of subdivision
two, use physical force upon another person when and to
the extent he or she reasonably believes such to be
necessary to defend himself, herself or a third person
from what he or she reasonably believes to be the use or
imminent use of unlawful physical force by such other
person, unless:

(a) The latter's conduct was provoked by the actor with
intent to cause physical injury to another person; or

(b) The actor was the initial aggressor; except that in
such case the use of physical force is nevertheless
justifiable if the actor has withdrawn from the encounter
and effectively communicated such withdrawal to such
other person but the latter persists in continuing the
incident by the use or threatened imminent use of
unlawful physical force . . . .

2. A person may not use deadly physical force upon
another person under circumstances specified in
subdivision one unless:

(a) The actor reasonably believes that such other person
is using or about to use deadly physical force. Even in
such case, however, the actor may not use deadly physical
force if he or she knows that with complete personal
safety, to oneself and others he or she may avoid the
necessity of so doing by retreating . . . .

(b) He or she reasonably believes that such other person
is committing or attempting to commit a . . . . robbery
. . . .

[15] The pertinent instructions were as follows:

    Now, let me explain the defense of justification.
"Justification" is often called self-defense. In this charge
I will call the defense by its formal name, that is

16

justification, in order to emphasize that there are special legal questions that must be resolved in connection with this defense that is -- that are different from when we talk about self-defense in normal parlance or as we view it in street language.

You must decide whether on the evidence that you have evaluated and accepted the defendants conduct was justified. The burden, as with the elements, is on the People to establish beyond a reasonable doubt that the defendant's conduct was not justified.

Justification has its own factors and the People can prove that the conduct was not justified by proving any one of these five factors beyond a reasonable doubt . . . . The defense of justification in this case is concerned with the use of deadly physical force.

"Deadly physical force" is defined as force under which the circumstances in which it is used is readily capable of causing death or serious physical injury . . . . The defendant may use deadly physical force upon another person, in this case, Mr. Rivera, to the extent that the defendant reasonably believed that such force was necessary to defend himself from actual or the imminent use of deadly physical force against him by Mr. Rivera . . . .

"Imminent" means immediate and present physical force, in other words, threatened physical force must be right at you. If the defendant did not reasonably believe that Mr. Rivera was using or about to use deadly physical force against him immediately, then it was not legal for the defendant to use physical force against Mr. Rivera that could cause Mr. Rivera to die or suffer serious physical injury.

In order for the People to prove that the defendant's conduct was not justified, in other words, that he was not legally allowed to use deadly physical force against Mr. Rivera, the People must prove beyond a reasonable doubt any one of the following five factors:

First, the initial aggressor; second, the defendant's subjective belief; third, the defendant's objective belief; four, the ability or the knowledge of the ability to retreat; five, the use of excessive force.

Now, let me tell you about the first one, the initial aggressor. The first factor for you to consider is who was the initial aggressor, Mr. Rivera or the defendant. The People must prove beyond a reasonable doubt that at the incident on October 3, 2002, the defendant was the initial aggressor.

17

If the People prove beyond a reasonable doubt that the defendant was the initial aggressor, then you must find the defendant to be guilty . . . .

A person who reasonably believes that another person is about to use deadly physical force against him doesn't have to wait until he is struck if the person reasonably believes that the other person is about to use deadly physical force upon him, he may act first and is not the initial aggressor . . . .

You must determine whether the People have proved beyond a reasonable doubt that the defendant did not actually believe that at the time he stabbed Mr. Rivera that he had to use deadly physical force to defend himself against the actual use of imminent or deadly physical force by Mr. Rivera. This factor is called the subjective factor. It explores what the defendant himself believed . . . .

If you find that the People have proven beyond a reasonable doubt that the defendant did not actually and -- actually believe that at the time he stabbed Mr. Rivera, that he was facing the actual use of deadly physical force from Mr. Rivera, then there is no justification defense and you must find the defendant to be guilty . . . .

The People must prove beyond a reasonable doubt that the defendant's belief that he was facing actual or imminent deadly physical force at the time that he stabbed Mr. Rivera was unreasonable, that is, that a reasonable person would not have believed under the circumstances that existed and with the knowledge that the defendant had, whether that knowledge was right or wrong. The defendant's reactions must be those of a reasonable person in similar circumstances, that's called the objective factor . . . .

If you find that the People have proven beyond a reasonable doubt that the defendant's position would not have -- that a reasonable person in the defendant's position would not have reasonably believed that he was facing actual or imminent deadly physical force at the time he stabbed Mr. Rivera, then there is no justification and you must find the defendant to be guilty . . . .

The next issue you must consider is whether the People have proven beyond a reasonable doubt that the defendant knew that he could have retreated with complete safety to himself.

If a defendant is confronted with deadly physical force but knows that he can retreat with complete safety and he doesn't do that, the defense of justification by use of physical force does not apply . . . .

18

The judge did not charge the jury with the variant of the justification defense defined by section 35.15(2)(b), which applies if the defendant "reasonably believes that such other person is committing or attempting to commit . . . . robbery." In such circumstances the defendant has no duty to retreat and may use deadly physical force even in the absence of a threat of deadly physical force against him. See, e.g., Jackson v. Edwards, 404 F.3d 612, 623 (2d Cir. 2005); see also, e.g., People v. Richardson, 294 A.D.2d 379, 380, 742 N.Y.S.2d 645, 645 (2d Dep't 2002); cf., e.g., People v. Ze-Jun Wang, 843 N.Y.S.2d 822, 825, 17 Misc.3d 953, 957 (N.Y. Sup. Ct. 2007) ("PL § 35.15(2)(b) permits the use of deadly force when a person reasonably believes that he or she is the victim of a forcible rape or forcible criminal sexual act.").

---

Even if the defendant was justified in using deadly physical force at the beginning of the incident on October 3, 2002, you must decide if the People have proven beyond a reasonable doubt that the defendant's right to use deadly physical force ended at some point during the incident because there was no longer a threat to him of deadly physical force or he could no longer believe either subjectively or objectively that there was such threat or actual physical force against him.

If he used deadly physical force after Mr Rivera was no longer a threat to him, then the defendant was not acting in self-defense. The defendant was not permitted to continue to use deadly physical force against Mr. Rivera if the threat that was first posed by Mr. Rivera no longer existed.

(Tr. 77-87).

vi. Verdict and Sentence

On May 5, 2004, the jury convicted petitioner of one count of Assault in the First Degree, under N.Y.P.L. § 120.10(1), and acquitted him on all other counts. (T3. 107-09). On November 24, 2004, the court sentenced Rodriguez, a predicate felon, to a determinate prison term of ten years and five years of post-release supervision. (T6. 4-5).

B. Direct Appeal

Petitioner timely appealed from his conviction to the Appellate Division, First Department, asserting two claims. First, he argued that he had been deprived of a fair trial because the justification charge given to the jury was based on section 35.15(2)(a), and therefore improperly imposed a duty to retreat and a requirement that the defendant be defending himself from deadly physical force before using such force himself. (Corr. Br. 21). According to Rodriguez, the court should have used a justification instruction based on section 35.15(2)(b), which includes neither a duty to retreat nor a requirement that the accused be defending himself from deadly physical force, but rather permits him to use deadly force to prevent, inter alia, a robbery. (Corr. Br. 21-22).

Second, Rodriguez argued that trial counsel's failure to request a section 35.15(2)(b) charge and his failure to object to the jury charge presented by the court constituted ineffective assistance of trial counsel.[16] (Id. at 23-26).

The State responded by arguing that Rodriguez's attack on the jury charge was unpreserved because his attorney had failed to object to the charge at trial. (Respt.'s Mem. of Law 10, 18-19). In the alternative, it asserted that any error regarding the justification charge was harmless, as there was no reasonable possibility that the verdict would have been different had the jury been charged with the robbery-defense justification, since the evidence plainly contradicted any theory of self-defense. (Id. at 22-26). As for Rodriguez's claim for ineffective assistance of trial counsel, the State suggested that it was not properly a subject of appellate review because Rodriguez had never filed a post-judgment motion raising this claim, and that in any event it was meritless because Rodriguez was not prejudiced by counsel's inaction. (Id. at 32-38).

_____

[16] Petitioner also argued that the imposition of the DNA databank fee violated the Ex Post Facto Clause of the United States Constitution, Amendments VI & XIV, and the New York State Constitution, Article 1 section 6, and accordingly should be vacated. (Corr. Br. 29). The State agreed that the DNA databank fee should be vacated. (Alabre Aff. at attached Mem. of Law (Respt.'s Mem. of Law) 39).

On October 10, 2006, the Appellate Division affirmed Rodriguez's conviction. People v. Rodriguez, 33 A.D.3d 389, 821 N.Y.S.2d 755 (1st Dep't 2006). Specifically, the Appellate Division stated:

> Defendant's challenge to the court's justification charge is unpreserved and we decline to review it in the interest of justice. Were we to review this claim we would find that although, under the facts presented, defendant was entitled to a charge on use of force in defense against a robbery (see Penal Law 35.15[2][b]), the absence of such charge did not prejudice defendant "[b]ecause there was overwhelming evidence disproving the justification defense and no reasonable possibility that the verdict would have been different had the charge been correctly given" (People v. Petty, 7 N.Y.3d 277 285, 852 N.E.2d 1155, 819 N.Y.S.2d 684 [2006]). For the same reason, counsel's failure to request a charge on defense against a robbery did not constitute ineffective assistance under the state and federal standards (see People v. Benevento, 91 N.Y.2d 708, 713-714, 697 N.E.2d 584, 674, N.Y.S.2d 629 [1998]; see also Strickland v. Washington, 466 U.S. 668, 104 S Ct 2052 80 L. Ed. 2d 674 [1984]).

Id. at 389, 821 N.Y.S.2d at 756.[17] On November 7, 2006, the New York Court of Appeals denied petitioner's application for leave to appeal. People v. Rodriguez, 7 N.Y.3d 904, 826 N.Y.S.2d 613 (2006).

C. Proceedings in this Court

After exhausting his state-court remedies, Rodriguez timely

---

[17] The Appellate Division also vacated the imposition of the DNA databank fee. Rodriguez, 33 A.D.3d at 390, 821 N.Y.S.2d at 756.

filed a petition for a writ of habeas corpus in this court on January 18, 2007. Petitioner asserts one claim, that his Sixth Amendment right to the effective assistance of trial counsel was denied because his attorney failed to object to the justification charge that was given at trial and did not request a robbery-defense instruction.

Respondent argues that the Appellate Division's determination that petitioner was not deprived of the effective assistance of trial counsel was not an unreasonable application of <u>Strickland v. Washington</u>, 466 U.S. 668, and, as a result, that petitioner should be denied habeas relief. (Respt.'s Mem. of Law 5).

II. <u>Analysis</u>

A. <u>The Standard for Habeas Review</u>

Under the habeas statute, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the scope of our review of state-court decisions addressing the merits of a federal claim is limited. The statute precludes habeas relief with respect to any claim adjudicated on the merits in state court unless that state-court decision is either "contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States," or is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see also Williams v. Taylor, 529 U.S. 362, 375-76 (2000); accord Larrea v. Bennett, 368 F.3d 179, 182-83 (2d Cir. 2004).

Under the statute, a state court judgment is "contrary to . . . clearly established Federal law" if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or . . . decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413 (O'Connor, J.).[18] The use of the term "contrary to" indicates that the state-court decision must be "substantially different from the relevant precedent." Id. at 405. A state-court decision unreasonably applies Supreme Court precedent if the court "identifies the correct governing legal principle from [the Supreme] Court decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413 (O'Connor, J.). This analysis applies in two circumstances -- if the state court identifies "the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the

---

[18] The opinion of Justice O'Connor is the opinion of the Court in Williams with respect to the interpretation of section 2254(d)(1). See, e.g., Francis S. v. Stone, 221 F.3d 100, 108-09 (2d Cir. 2000).

24

facts of the particular state prisoner's case," or if the state court "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. Even if the state-court decision is found to have been incorrect, however, that does not automatically translate into an unreasonable application of governing law; in addition to being incorrect, application of Supreme Court precedent must also have been objectively unreasonable. Woodford v. Visciotti, 537 U.S. 19 (2002). Thus, "[s]ome increment of incorrectness beyond error is required." Francis S., 221 F.3d at 111.

These limitations on habeas review apply only if the state court adjudicated the claim on the merits in state court. 28 U.S.C. § 2254(d). That is the case here. The Appellate Division rejected petitioner's Sixth Amendment claim, relying on the standards established not only in People v. Benevento, 91 N.Y.2d 708, 674 N.Y.S.2d 629 (1998), but also by Strickland v. Washington, 466 U.S. 668 (1984). See Rodriguez, 33 A.D.3d at 389, 821 N.Y.S.2d at 756. Thus, the Appellate Division's adjudication of petitioner's claims was an adjudication on the merits. See, e.g., Larrea, 368 F.3d at 183 ("A court adjudicates a claim on the merits 'when it (1) disposes of the claim on the merits, and (2) reduces its

disposition to judgment.'") (citing <u>Sellan v. Kuhlman</u>, 261 F.3d 303, 312 (2d Cir. 2001) (internal quotation marks omitted)).


B. <u>Sixth Amendment Standards</u>


To demonstrate a violation of his constitutional right to the effective assistance of counsel, a petitioner must show that his lawyer's performance was "so defective that 'counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment' . . . and that counsel's errors were 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" <u>Brown v. Artuz</u>, 124 F.3d 73, 79 (2d Cir. 1997) (quoting <u>Strickland</u>, 466 U.S. at 687). As summarized in <u>Brown</u>:

> To satisfy the first, or "performance," prong, the defendant must show that counsel's performance was "outside the wide range of professionally competent assistance," . . . and to satisfy the second, or "prejudice," prong, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

<u>Id.</u> at 79-80 (quoting <u>Strickland</u>, 466 U.S. at 690, 694); <u>accord, e.g.</u>, <u>Henry v. Poole</u>, 409 F.3d 48, 62-64 (2d Cir. 2005); <u>Cox v. Donnelly</u>, 387 F.3d 193, 197 (2d Cir. 2004).


It bears emphasis that the <u>Strickland</u> standard is quite deferential, and that a claim of constitutional dimension does not

26

arise unless a lawyer's error is so egregious as to amount to a failure to provide reasonable professional representation. Henry, 409 F.3d at 63. Thus, a habeas court weighing an ineffective-assistance claim "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct," and must "determine whether, in light of all the circumstances, . . . [counsel's] acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690; accord, e.g., Loliscio v. Goord, 263 F.3d 178, 192 (2d Cir. 2001). In making this determination, "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 690.

The burden of proving prejudice is equally onerous. As noted, the petitioner must demonstrate "a reasonable probability" that, but for counsel's unprofessional errors, the result of the proceeding would have been different. "A reasonable probability is one sufficient to undermine confidence in the outcome of the trial or appeal." Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001) (citing Strickland, 466 U.S. at 694).

## C. Assessment of Petitioner's Claim

### i. Objective Deficiency

The Appellate Division concluded that the trial record justified a robbery-defense instruction, and this determination is of course entitled to deference here. See, e.g., Parron v. Quick, 869 F.2d 87, 89 (2d Cir. 1987) (mid-level state appellate court ruling on purely state-law questions is entitled to presumptive deference). The failure of trial counsel to request that charge may well qualify as deficient representation since the robbery-defense test is easier to satisfy than the general justification defense presented to the jury and since the trial judge ruled that there was no evidence to support an element of the justification defense actually given to the jury. Nonetheless, we need not engage in this assessment since petitioner's claim fails for lack of demonstrable prejudice. As the Court in Strickland observed:

> a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

Id. at 697. The Appellate Division, which rejected Rodriguez's Sixth Amendment claim for lack of demonstrated prejudice, did not

apply the Strickland standard incorrectly or unreasonably.

## ii. Prejudice

Petitioner's claim must be rejected because he cannot demonstrate that his counsel's failure to request a robbery-defense instruction sufficiently prejudiced him -- that is, that there is a reasonable probability that such an instruction would have led to an acquittal. In rejecting Rodriguez's Sixth Amendment claim, the Appellate Division ruled squarely on the issue of prejudice, finding that "the absence of such charge did not prejudice defendant '[b]ecause there was overwhelming evidence disproving the justification defense and no reasonable possibility that the verdict would have been different had the charge been correctly given.'" Rodriguez, 33 A.D.3d at 389, 821 N.Y.S.2d at 756. Given the trial record, this conclusion is eminently reasonable under Strickland.

The two versions of the justification defense contain common elements that petitioner failed to meet. First, both defenses require the jury to determine whether the defendant used force on the basis of an objectively reasonable belief that the other person posed a threat, though the nature of the required threat differs under the two defenses. In the case of the (2)(a) defense, the jury

must decide whether the defendant had a reasonable belief that he faced actual or imminent deadly physical force, whereas in the case of the (2)(b) defense he must have reasonably believed that he faced an actual or attempted robbery. Second, the jury must determine whether the defendant reasonably believed that the force he used was necessary at the time, either for self-defense against actual or imminent deadly physical force (under section (2)(a)), or as necessary to terminate the actual or attempted robbery (under section (2)(b)). In other words, the force used must not be excessive under the circumstances. As explained by the New York Court of Appeals:

> While the portion of section 35.15(2)(b) pertaining to the use of deadly physical force to avert a felony such as robbery does not contain a separate 'retreat' requirement, it is clear from reading subdivisions (1) and (2) of section 35.15 together, as the statute requires, that the general 'necessity' requirement in subdivision (1) applies to all uses of force under section 35.15, including the use of deadly physical force under subdivision (2)(b).

Goetz, 68 N.Y.2d at 106, 506 N.Y.S.2d at 21-22; see, e.g., Leggio v. Leggio 190 Misc.2d 571, 578, 737 N.Y.S.2d 259, 264 (N.Y. Fam. Ct. 2002) ("[T]he [Court of Appeals in Goetz] held that the belief by the defendant that deadly physical force was justified had to be reasonable, not just to him, but to a reasonable person in the defendant's circumstances.")

30

Based on the trial evidence, it is highly unlikely that a reasonable jury would have found that Rodriguez met the "reasonable belief" threat requirement under either version of the justification defense. The evidence indicated that only one weapon had been used in the altercation between Rodriguez and Rivera, and it also reflected that only Rivera had been injured. This strongly suggests that Rodriguez alone wielded the knife. If so, it is highly implausible that Rodriguez was faced either with an immediate threat of deadly force by Rivera or with a robbery attempt. Moreover, petitioner's testimony about this "tussle" was problematic at best and cast significant doubt on his credibility. He simultaneously professed no knowledge of how Rivera was injured or even that he was injured at all, disclaimed any explanation for how he himself managed to escape unscathed while Rivera suffered four serious knife wounds, including at least one life-threatening wound, and further asserted that he had no recollection of ever holding the knife. (T2. 170-72).

As to the "necessity" requirement of both justification defenses, it is very hard to discern how necessity could have impelled petitioner to inflict these stab wounds, particularly the one or two wounds in Rivera's back. Even if the jury found that Rivera had initiated the encounter while armed with a knife, Rodriguez must have seized it at some point in the encounter. Once

petitioner gained control of the knife, his use of deadly force against Rivera, even if originally justified, ceased to be based on a reasonable apprehension that he was faced with either the use of deadly physical force or a robbery at the hands of Rivera, or that deadly force on his part was necessary. As for the wounds on Rivera's back, presumably Rivera was facing away from Rodriguez when petitioner inflicted them. In that circumstance Rodriguez's rationale for continuing to use deadly force is even more inexplicable. The jury was most unlikely to find that Rodriguez had a reasonable belief in the necessity of stabbing Rivera once he had turned his back, suggesting that he was in the process of fleeing. See, e.g., People v. Vecchio, 240 A.D.2d 854, 855, 658 N.Y.S.2d 720, 720 (3d Dep't 1997) (use of dangerous instrument against unarmed man is excessive use of force, precluding justification defense); People v. Thompson, 212 A.D.2d 647, 647, 622 N.Y.S.2d 578, 578 (2d Dep't 1995) (use of force was unreasonable where deceased was shot while fleeing from the defendant); People v. Walker, 168 A.D.2d 983, 983, 564 N.Y.S.2d 929, 930 (4th Dep't 1990) (evidence was sufficient to disprove justification defense, as it indicated that the victim stepped back before being stabbed).

Given the state of the record, it is highly unlikely that the jury, even if told to apply the more flexible version of the justification charge, would have acquitted Rodriguez. Accordingly,

he has not shown that he was prejudiced by counsel's failure to argue for a robbery-defense charge.

In a further effort to press his Sixth Amendment claim, petitioner asserts that post-trial comments by one of the jurors suggest that the outcome of the trial might have been different had the proper charge been given. According to petitioner, "The juror told counsel that the jury believed that petitioner used deadly force even after securing his safety. The comment leaves ambiguous whether the jury believed that Rivera at some point no longer threatened deadly force, ordinary force, or to rob appellant. So long as Rivera posed a robbery risk, petitioner was entitled to use deadly force." (Petr.'s Mem. of Law 26). This argument fails on several grounds.

Absent a showing of extrinsic evidence affecting jury impartiality, post-verdict analysis of a jury's deliberative process is improper. See, e.g., United States v. Powell, 469 U.S. 57, 66-67 (1984) ("Courts have always resisted inquiring into a jury's thought processes.") (citations omitted); see also United States v. Snype, 441 F.3d 119, 140 (2d Cir. 2006) ("Courts generally may not question jurors concerning any matter relating to jury deliberations other than the potential exposure of jury members to 'extraneous prejudicial information.'") (citing Fed. R.

Evid. 606(b)); United States v. Thomas, 116 F.3d 606, 618 (2d Cir. 1997) (emphasizing that "[t]he secrecy of deliberations is the cornerstone of the modern Anglo-American jury system"); United States v. Crosby, 294 F.2d 928, 950 (2d Cir. 1961) ("There are many cogent reasons militating against post-verdict inquiry into juror's motives for decision. The jurors themselves ought not be subjected to harassment; the courts ought not be burdened with large numbers of applications mostly without real merit; the chances and temptations for tampering ought not be increased; verdicts ought not be made so uncertain."). Petitioner offers no reason not to follow this traditional principle here.

Furthermore, even if this argument were cognizable, it would not change the result. As described, the meaning of the juror's statement is speculative and easily construed as adverse to Rodriguez's arguments. According to counsel's characterization, the juror appeared to indicate that the jury accepted that Rivera had initiated the incident, but concluded that during the course of the struggle petitioner gained control, and then exerted force against complainant that either was not based on a reasonable apprehension of an imminent threat or else occurred after the termination of the threat. In short, the implication of the comment is that the jurors found the use of force neither necessary nor reasonable.

## D. Conclusion as to the Sixth Amendment Claim

Rodriguez has failed to demonstrate that his counsel's failure to request a defense-against-robbery justification charge was prejudicial. Necessarily, then, the Appellate Division did not apply Strickland incorrectly, much less unreasonably. Additionally, because the evidence strongly supports the Appellate Division's finding of a lack of prejudice, that court did not rest its decision on an "unreasonable determination" of the facts. Accordingly, there is no basis for habeas relief in these circumstances. See 28 U.S.C. § 2254(d).

## CONCLUSION

For the reasons stated, we recommend that the writ be denied and the petition dismissed. We also recommend denial of a certificate of appeal.

Pursuant to Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Shira Scheindlin, Room 1620, 500 Pearl Street, New York, New York

10007-1312, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York 10007-1312. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985), reh'g denied, 474 U.S. 1111 (1986); Small v. Sec'y of Health and Human Services, 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(d).

Dated: **New York, New York**
**August 15, 2008**

**RESPECTFULLY SUBMITTED,**

**MICHAEL H. DOLINGER**
**UNITED STATES MAGISTRATE JUDGE**

36

Copies of the foregoing Report and Recommendation have been mailed this day to:

Robert S. Dean, Esq.
Gayle Pollack, Esq.
Center for Appellate Litigation
74 Trinity Place, 11th Floor
New York, NY 10006

Rither Alabre, Esq.
Karen Swiger, Esq.
     Asst. District Attorneys for Bronx County
198 East 161st Street
Bronx, New York 10451